1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

WANDA MUNOZ, INDIVIDUALLY AND AS NEXT
FRIEND TO MINOR CHILD, C.B.,

                              Plaintiffs,
                                        Case No.
              - against -              17 CIV. 9583

THE CITY OF NEW YORK, ET AL,

                              Defendants.

---------------------------------------X


                    80 Pine Street
                    New York, New York

                    August 16, 2018
                    10:09 A.M.




          DEPOSITION of RYAN PIERCE, one

of the Defendants herein, taken by the

attorney for the Plaintiffs, pursuant to Notice,

and held before Deborah Thier, a Notary Public of

the State of New York at the above-stated time and

place.


              *    *    *    *

Ryan Pierce                                    5

A    Yes.

Q    Let me know if you need a break, just don't ask for a break in the middle of a question; okay?

A    No problem.

Q    So were you working as a lieutenant at the 49th Precinct on May 30th, 2017?

A    Yes, I was.

Q    Do you recall responding to a call with an emotionally disturbed person at 1315 Loomis Avenue on May 30th, 2017?

A    Yes.

Q    What do you remember about what information you had about an emotionally disturbed person call on May 30th, 2017?

A    You're referring to like what came over the radio?

Q    Yes.

A    If I'm not mistaken, it just came over as a violent EDP, I think, throwing things.  I'm not really a hundred percent sure.  We don't get a lot of information on the radio for that, so it would just be something very basic like that.

Q    When you answer questions, I'm just

Ryan Pierce                          6

asking you what you remember, not what you usually get or --

A      Okay.

Q      -- et cetera.

So my question is, what you just described as information you received, is that the information you recall receiving on May 30th, 2017 with regard to an EDP?

A      No, I don't remember exactly what came over the radio.

Q      The information that came over the radio, would that be the same information that other members of the 49th Precinct would have received with regard to that call?

MS. CHAVEZ:  Objection.

A      I'm not quite sure what you're asking. Everyone's on the same frequency, so everyone would have heard the same transmission, if that's what you meant.

Q      Yes.

A      Yes.

Q      Before you arrived at 1315 Loomis Avenue, did you receive any other information about what was going on there other than that

Ryan Pierce                    12

Q     Were there any F.D.N.Y. vehicles or ambulances in the area?

A     I didn't see any.

Q     What did you do when you arrived?

A     First thing we had to do was figure out where we were gonna get entry to the building.

Q     How did you do that?

A     We ended up having to walk around to the other street, and there was like a sort of an -- the best way to describe it is sort of a warehouse door type thing that we went in.

Q     Was it open?

A     I believe it was.

Q     And you just walked in?

A     Yeah.

Q     What did you observe when you walked in?

A     Well, immediately when I walked in I saw there was kind of like almost a warehouse thing.  They had some stuff on shelves, I saw the aided that we got called for handcuffed sitting in a chair.

Q     When you say you saw the aided, are you referring to the person we'll refer to as C.B.?

Ryan Pierce                            17

Officer Lewis also had Officer Chaparro with him.

Q    What about Officer Henry, was she there when you arrived?

A    I'm not sure.

Q    What about Officer Wroten?

A    Well, he would have came with Officer Henry, so I'm not sure if he was there when I first got there either.

Q    Is it possible you walked in with Officer Henry and Officer Wroten?

A    It's possible, but I don't think that I did.

Q    You said that C.B. was sitting in a chair when you arrived.

Was he cuffed?

A    Yes.

Q    Who made the decision to cuff C.B. before you arrived?

A    It would have been whoever was there first.

Q    Did you ask who made the decision to cuff C.B.?

A    No.

Q    Did you ask anybody why he was in

Ryan Pierce                                18

handcuffs?

     A     No.

     Q     When you walked in, what was C.B.'s demeanor like?

     A     He was just sitting in the chair.

     Q     Was he calm?

     A     He seemed calm.

     Q     Do you remember anything else about his demeanor when you walked in?

     A     Nothing specific.

     Q     Did the situation generally seem calm and under control when you walked in?

     A     Yeah, more or less.

     Q     Well, you say more or less.

           Is there something that indicated to you as you walked in that the situation was not under control?

     A     Well, it seemed like it was under control at the time, but there was stuff all over the floor, which I sort of presumed to have been thrown there.

           The staff was upset, so it wasn't like -- you know, it wasn't like a walk through the park.  You know, obviously, a tense situation had

Ryan Pierce                    19

occurred prior to my arrival, but it seemed under control when I got there.

Q    What was the stuff that was on the floor?

A    Whatever was on the shelves.  It seemed like it was bathroom supplies, if I remember right.

Q    Did you take any pictures of the stuff on the floor?

A    No.

Q    Did you instruct anybody else to take pictures of the stuff on the floor?

A    No.

Q    When you first walked in and C.B. was in the chair, where were the officers in relation to C.B.?

A    I remember somebody standing next to him.  I don't really remember who it was.

Q    Was it a police officer?

A    Yeah.

Q    Where were the other officers standing?

A    When I first got there, I spoke to one of their staff members, so I'm not really sure of what people were doing behind me.

Ryan Pierce                    20

Q    When you first walked in, was the first person you spoke to a staff member, or did you speak to one of the officers first?

A    I'm not really sure.  It's possible I spoke to one of the cops.  It's nothing that stuck out -- in my mind I remember first speaking to the staff member.

Q    Who initiated that conversation?

A    I did.

Q    What did you ask?

A    I just asked what happened.

Q    This is the African American woman you described?

A    Yes.

Q    What did she say?

A    She basically told me that the aided was throwing stuff around the warehouse and that prior to this incident he had another incident where he bit two staff members, causing them to have to get hospital treatment.  That was basically it.

Q    Was it your understanding that he had bit two staff members on that date, May 30th, 2017?

Ryan Pierce                        21

A    Not that day, no.

Q    Did you ever find out when he had bitten the staff members?

A    No, I didn't really ask.

Q    So from your perspective that could have happened two years earlier; right?

MS. CHAVEZ:  Objection.

A    Well, I don't know what happened.  She made it seem like it was relatively recent.

Q    How did she make it seem like it was relatively recent?

A    I don't remember her exact words, but it was concerning enough that she was there and concerning enough to her that she mentioned it being relevant to the situation that was happening currently.

Q    Your testimony is that at the time you did not know the date on which C.B. bit two staff members; correct?

A    Well, she might have told me, I just don't remember her telling me.  I don't remember at the time what I knew.  I just don't know.

Q    Did you write it down anywhere?

A    No.

Ryan Pierce                          37

interactions with Ms. Munoz?

A     Yes.

Q     Can you describe those interactions?

A     Sure.

She asked me why he was handcuffed, which I explained to her why.  She told me that as his guardian, she didn't want him going to the hospital, and I explained to her why he was gonna go to the hospital, and that was pretty much it.

MR. SIMPSON:  Can I just have the answer read back, please.

(Whereupon, the requested section was read back.)

Q     By the time Ms. Munoz showed up, the decision had already been made to take C.B. to the hospital; correct?

A     Yes.

Q     Who made the decision?

A     So for us the procedure is if we have a person who's qualified as an EDP, they go to the hospital.

Q     At the time that he was sitting in the chair handcuffed when Ms. Munoz came in, was he qualified as an EDP?

Ryan Pierce                                38

A       Yes.

Q       What was he doing that indicated to you he was an EDP?

A       Well, like I said, staff members told us he was acting violent, throwing things around the warehouse, which would have made him a danger to himself or others, so which made him an EDP.

Q       For the entire time you observed C.B., he was calm; correct?

A       He was handcuffed.

Q       My question is, he was calm; correct?

A       I think so.

Q       Well, do you recall him doing anything that would indicate that he was not calm?

A       Well, I don't remember him being verbal when he was handcuffed, so I'm not really sure what he would have done.

Q       Do you know if C.B. is capable of being verbal?

A       I'm not sure, no.

Q       Did you ask anybody at the scene?

A       I'm not sure if I did or not.

Q       Was he struggling to get out of the handcuffs at any point that you observed him on

Ryan Pierce                               39

May 30th, 2017?

A    I didn't really see anything that was going on with his hands.

Q    Did anybody indicate to you or did you observe him resisting any direction in any way on May 30th, 2017?

A    No.

Q    So your conclusion that he was an EDP was based on the behavior he exhibited prior to your arrival; correct?

A    Yes.

Q    You just described your conversation with Ms. Munoz.

Do you have any idea how long that conversation was?

A    Again, I'm not really good at times.  I remember it being relatively brief.

Q    I appreciate your candor on that rather than trying to guess, as many people do.

You said she asked why her son was in cuffs and you explained to her why.

What did you explain to her?

A    I explained to her it's policy when we have an emotionally disturbed person that they

Ryan Pierce                          40

have to be handcuffed and taken into custody prior

to their removal to the hospital.

Q    Who decided that C.B. was an

emotionally disturbed person?

A    I'm not sure what you're asking.

Q    Well, you're describing the call and

C.B. as an emotionally disturbed person.

Who determined that he was qualified as

an emotionally disturbed person?

MS. CHAVEZ:  Objection.

A    No one really makes a specific

determination.  It's just that -- every single

police person there would recognize that as an

EDP.  You have a developmentally disabled person

acting violent.  They would -- I mean, it's not

like -- I didn't directly say, hey, this is an

EDP, or anything like that.

Q    You said that you believed that C.B.

was acting violent.

What did you learn that he was doing

that constituted an act of violence?

MS. CHAVEZ:  Objection.

A    Well, like I said, when the call came

over, it came over as violent EDP, and the staff

Ryan Pierce                         41

member told me he was throwing stuff around the warehouse.

Q    Is it possible for the police to be called for somebody alleged to be an EDP and by the time the officers arrive the person is no longer in a disturbed state?

MS. CHAVEZ:  Objection.

A    Yeah.  I mean, of course.  Anything's possible.

Q    So under those circumstances would you still require that the person be removed to the hospital?

MS. CHAVEZ:  Objection.

A    So there would be circumstances where you would and there would be circumstances where you wouldn't.

Q    What are the circumstances where you would not remove somebody who had been classified as an EDP to the hospital?

A    Well, we wouldn't -- so we are -- who are you saying classified the person as EDP?

Q    Well, that's what I'm asking you really.

A    Well, you just referred to a person as

Ryan Pierce                        42

classified as an EDP.  Are you talking about it came over the radio that way?

Q    Yes.

A    So if it came over the radio as an EDP and we get there and there's no evidence that the person is actually acting oddly or in a manner dangerous to themself or others and there's not a person there telling us the person is not deranged, we're probably not going to remove them.

Q    You used the word deranged.  Did you think that C.B. was acting in a deranged way?

          MS. CHAVEZ:  Objection.

A    Well, like I said, I wasn't there when he was throwing stuff around, so I don't really know the answer to that.

Q    Well, why did you use the word deranged?

A    I don't know.

Q    Are there rules or protocols that you have to follow when deciding when to remove a minor EDP to the hospital?

A    The EDP procedure does not specify a difference between adult and minor.

Q    Are you required to handle the

Ryan Pierce                                46

MS. CHAVEZ:  Objection.

A    Yes.

Q    Did you think it was possible that she was one of those people?

MS. CHAVEZ:  Objection.

A    I don't know why she was upset.

Q    Did she appear to be intoxicated?

A    No.

Q    Did she appear to be under the influence of any kind of drugs?

A    No.

Q    We talked about your explanation to her about why her son was in handcuffs, but you also testified that you explained to her why he was going to the hospital.

What did you say to her about why he was going to the hospital?

A    I don't remember verbatim, but it would have been something along the lines of, you know, that everyone's determined him to be a danger to himself or others, so we would be removing him to the hospital and her permission wasn't required.

Q    What lead you to believe that he was a danger to himself at that moment?

Ryan Pierce                                60

A    Right.

Q    So going back to the manner in which you assisted him, were you on his left side or his right side?

A    His left.

Q    You said you had hooked your arm underneath his to help him maintain his balance?

MS. CHAVEZ:  Objection.

A    I'm not sure if I hooked my hand or used my hand to grab under his shoulder area to help him.  I don't know.  I just remember physically helping him.

Q    Was anybody else assisting him at this point?

A    If I remember right, E.M.T. Mejia was in the ambulance trying to assist him.

Q    What about the female E.M.T., where was she at this point?

A    I don't know.

Q    Was anybody on his right side helping him keep his balance or was it just you on his left side?

A    I think it was just me.

Q    What happened?

Ryan Pierce                61

A      Ms. Munoz grabbed him by his right arm and pulled on him to prevent him from getting into the ambulance.

Q      What happened after she grabbed his right arm?

A      Officer Henry issued a warning that she could be arrested, and she pulled on him again.

Q      Where was Officer Henry standing?

A      She was to my right.

Q      Did you give Ms. Munoz a warning as well?

A      I don't remember if I did or not.

Q      Just so I understand, where were C.B.'s feet at the time that you claim that Ms. Munoz grabbed him by the arm and pulled him back?

A      I think he was on that first step with me that comes off the back of the ambulance.

Q      Were both his feet on the first step?

A      I'm not really a hundred percent sure.

Q      After, as you described, Ms. Munoz grabbed his arm, were both of his feet then back on the ground after that happened?

A      I don't remember him actually falling or anything like that, so I don't think so.

Ryan Pierce                    62

Q      Was Ms. Munoz saying anything that you remember during this time?

A      Not that I specifically remember.

Q      So after, as you described, Officer Henry warned Ms. Munoz, what happened next?

A      Ms. Munoz physically pulled on his arm again, so Officer Henry placed her under arrest.

Q      So Ms. Munoz twice tried to pull C.B. back out of the ambulance, that's your testimony; is that correct?

A      Twice that I remember, yes.

Q      Where was the uncle at this time?

A      I'm not sure exactly.

Q      You testified that it was your belief that he was intoxicated; correct?

A      Yes.

Q      Are you permitted to allow an intoxicated guardian to escort a minor to the hospital?

MS. CHAVEZ:  Objection.

A      There's no specific rule against it.

Q      But the rules of the N.Y.P.D. is it's okay for you to permit an intoxicated guardian to escort a minor to the hospital; correct?

Ryan Pierce                          64

Q     Did you ask Ms. Munoz or her brother if there was another individual who could come and escort C.B. to the hospital, or I should say accompany C.B. to the hospital?

A     I don't specifically remember doing that, but I also -- she didn't express any concern that he was going to the hospital with him.

Q     So even though you claim that the brother, the uncle, was intoxicated, you felt comfortable allowing him to accompany the minor to the hospital because Ms. Munoz didn't object; correct?

MS. CHAVEZ:  Objection.

A     So I'm not sure that I felt comfortable with it, but like I said, it was the only option I had, and Ms. Munoz didn't specifically object.

Q     So calling and trying to see if there was another family member who could come in your view is not an option; correct?

MS. CHAVEZ:  Objection.

A     If she had expressed that she wanted us to do that, we absolutely would have done that.

Q     Who made the decision to place Ms. Munoz under arrest?

Ryan Pierce                          65

A    Officer Henry.

Q    Did you authorize her to make that decision or did she make that decision on her own?

A    So the police officer has the authority to make the arrest.  My duty is just to verify it, which is to determine if she had a probable cause, which in this case I said yes.

Q    You could have said to Officer Henry, hold back, we don't have probable cause, don't arrest her, you had authority to do that as her lieutenant; correct?

MS. CHAVEZ:  Objection.

A    If she did not have probable cause, yes, I would have done that.

Q    And you were of the opinion she had probable cause to arrest Ms. Munoz; correct?

A    Yes.

Q    Did you at any point that day tell Officer Henry that she could choose whether to process Ms. Munoz for an arrest or give her a C summons?

A    I'm sorry, can you repeat the question?

MR. SIMPSON:  We'll have it read back.

(Whereupon, the requested section was

Ryan Pierce                          66

read back.)

A    I'm not sure if I said exactly those words, but I do remember explaining to Officer Henry that she, of course, had authority, she had authority to utilize discretion, which may have, if it was a lesser charge, made Ms. Munoz eligible for a C summons.

Q    You left it to Officer Henry's discretion; correct?

MS. CHAVEZ:  Objection.

A    It was her arrest.

Q    Can you describe physically how Officer Henry placed Ms. Munoz under arrest?

A    I'm not quite sure what you're asking.

MR. SIMPSON:  Let me rephrase then and see if I can help you out.

Q    Did Officer Henry pull Ms. Munoz or make any physical contact with Ms. Munoz's body in placing her under arrest?

A    I remember her handcuffing her, so that would have been physical contact.

Q    How did Ms. Munoz go from holding her son's arm to being in handcuffs?  In other words, did Ms. Munoz do that on her own or did Officer