UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WANDA MUNOZ, individually and as next friend to minor child, C.B.,

                                    PLAINTIFFS,


          -against-                 Case No.:
                                    17-CIV-9583
                                    (LAK) (DF)


THE CITY OF NEW YORK, P.O. KATHY HENRY, P.O. RAINARD WROTEN, LT. RYAN PIERCE, P.O. JAMES FICO, P.O. JONYA MCDOWELL, P.O. ANTONIO LOMEDICO, P.O. KENNETH WOLSIN, EMERGENCY MEDICAL TECHNICIAN, ERNESTO MEJIA, EMERGENCY MEDICAL TECHNICIAN, BRUNY ORTEGA-GARCIA, JAMES P. O'NEIL, as Commissioner of the New York City Police Department, and DANIEL A. NIGRO, as Commissioner of the New York City Fire Department; sued herein in their official and individual capacities,

                                    DEFENDANTS.
-------------------------------------------------------------X


                    DATE:  August 14, 2018

                    TIME:  10:33 A.M




          DEPOSITION of the Plaintiff, WANDA MUNOZ,

taken by the Defendants, pursuant to an Order and to the

Federal Rules of Civil Procedure, held at the New York City

Law Department, 100 Church Street, New York, New York

10007, before Betty Teglasi Kaplan, a Notary Public of the

State of New York.


DIAMOND REPORTING  (877) 624-3287  info@diamondreporting.com

1

APPEARANCES:


BERANBAUM MENKEN LLP
        Attorneys for the Plaintiffs
        WANDA MUNOZ, individually and as
        next friend to minor child, C.B.,
        80 Pine Street, 33rd Floor
        New York, New York 10005
        BY:  SCOTT SIMPSON, ESQ.



ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
        Attorneys for the Defendants
        THE CITY OF NEW YORK, P.O. KATHY HENRY, P.O. RAINARD
        WROTEN, LT. RYAN PIERCE, P.O. JAMES FICO, P.O. JONYA
        MCDOWELL, P.O. ANTONIO LOMEDICO, P.O. KENNETH
        WOLSIN, EMERGENCY MEDICAL TECHNICIAN, ERNESTO MEJIA,
        EMERGENCY MEDICAL TECHNICIAN, BRUNY ORTEGA-GARCIA,
        JAMES P. O'NEIL, as Commissioner of the New York
        City Police Department, and DANIEL A. NIGRO, as
        Commissioner of the New York City Fire Department;
        sued herein in their official and individual
        capacities
        100 Church Street
        New York, New York  10007
        BY:  J. CAROLINA CHAVEZ, ESQ.
        File #:  2017-071914
        Control #:  171275



ALSO PRESENT:

        QIANA SMITH-WILLIAMS, ESQ., Corporation Counsel



                *          *          *

last name?  She is a minor.

Q.   You can give us her last name off the record.

A.   Thank you.

(The Witness gave Nicole's last name off the record.)

Q.   How old is Nicole H?

A.   She is thirteen.

Q.   You mentioned that you have discussed the incident with your family.  Is that right?

A.   Yes.

Q.   Does that include C.B.?

A.   No.

Q.   Why not?

A.   Because he's very low-functioning.  He has autism, and he would not understand.

Q.   We are going to get back to that in a little bit.

A.   Okay.

Q.   Have you talked about it with Nicole H?

MR. SIMPSON:  Objection.

A.   No.

Q.   At no point, did you talk to Nicole H about what happened on May 30, 2017?

MR. SIMPSON:  Objection.

A.   She is aware that I was arrested because, she had to go with a different family that day.  But other than

Q.    Are you aware that documents were provided to the defendants?

A.    I believe they were.

Q.    Did you review any audio or video in preparation for this deposition?

A.    No.

Q.    Other than your attorney or his staff, have you discussed the events of May 30, 2017 with anyone else other than your family as described before?

A.    No.

Q.    How about this lawsuit?

A.    No.

Q.    You haven't talked to anybody about having filed a lawsuit?

A.    No.

Q.    Have you ever been deposed before?

A.    No.

Q.    Have you ever testified as a witness in some sort of judicial or quasi-judicial proceeding?

A.    Yes.

Q.    When was that?

A.    That was for the past eighteen years.  I have testified at several court hearings, criminal mostly, as part of my course of business at work.

Q.    For the record, what is your job?

18

W. MUNOZ

A.    I am a New York State parole officer.

Q.    Have you been a parole officer for the past eighteen years?

A.    Yes.

Q.    Where are you assigned?

A.    In the Bronx.

Q.    Is there a particular office in the Bronx?

A.    Bronx 3.

Q.    What is the address?

A.    79 Alexander Avenue, Bronx, New York 10473.

Q.    What kind of court hearings are they?

A.    Preliminary hearings and final hearings on the record.  On occasion, I testify at the grand jury.  Or, I go to the DA's office and start a case for an arrest.  We did what we call "hits."  Hits are when we look for absconders or go into people's apartments if there is something to find like drugs or money.  We go in front of the DA to start a new case.

Q.    Roughly, how many times have you testified in some sort of judicial or quasi judicial proceeding as a parole officer?

A.    Over the course of the eighteen years that I have been a parole officer?

Q.    Yes.  I just need a ballpark estimate.

A.    Too many.  Over four or five hundred times.

A.    Yes.

Q.    Do you have a middle name?

A.    Yvette, Y-V-E-T-T-E.

Q.    Do you have any nicknames?

A.    No.

Q.    What is your date of birth?

A.    1969.

Q.    What is your Social Security number?

          MR. SIMPSON:  Please place just the last four digits on the record.

A.    XXX-XX-2719.

Q.    Do you have a driver's license?

A.    Yes.  I do.

Q.    From where is it issued?

A.    New York State.

Q.    Do you know the number of that driver's license?

          MR. SIMPSON:  Objection.

A.    I can get it for you.

          MR. SIMPSON:  Please keep the whole thing off the record.

          (The Witness gave the driver's license number off the record.)

Q.    Was your driver's license in effect on May 30, 2017?

A.    Yes.

W. MUNOZ

Q.     Is that also part of the New York City public school system?

A.     Yes.

Q.     How about your daughter, where does she go to school?

MR. SIMPSON:  Objection.

A.     Archimedes.

Q.     What grade is she in?

A.     She's about to start high school, so 9th grade.

Q.     Was she in middle school in May of 2017?

A.     Yes.

Q.     Archimedes is part of the New York City public school system as well?

A.     Yes.

Q.     Is C.B. currently in an after-school program?

A.     No.

Q.     In May of 2017, was Lifespire C.B.'s only after-school program?

A.     Yes.

Q.     For how long had he been attending?

A.     He had been there for close to three years.

Q.     Did he attend any other after-school programs before starting there?

A.     Yes.  He attended SUS after-school program located at 1013 East 163 Street in the Bronx.  He was there

W. MUNOZ

medical history now.

A.   Okay.

Q.   What is C.B.'s date of birth?

A.   March 17, 2001.

Q.   What is his Social Security number?  And we will only be putting the last four digits on the record.

A.   I do not have that with me at this time.

Q.   Is that something you would be able to provide?

A.   Sure.

MS. CHAVEZ:  If you could get back to Mr. Simpson with C.B.'s Social Security number, I would appreciate it.

MR. SIMPSON:  Please follow up in writing, and we will be happy to respond.

Q.   How tall C.B.?

A.   He is right now five-foot-seven.

Q.   Was he roughly the same height on May 20, 2017?

A.   An inch smaller then.  He was five-foot-six.

Q.   How much does C.B. weigh?

A.   270 pounds right now.

Q.   How much did he weigh on May 30, 2017, if you know?

A.   230 pounds.

Q.   Does he have his own health insurance?

A.   No.  He's still goes to the same pediatrician he

W. MUNOZ

way he could have spoken back to me.  But he would speak to me, and, then, he would walk away.

Q.    Why were you telling him to calm down?

A.    As per Terence, that called me from Lifespire and telling me that he was throwing things around a bit, and telling me that he was pacing and throwing things.

Q.    By the time that you were on the speaker phone, and you were telling him to calm down, were those behaviors still going on?

A.    Not while we were on the phone.

Q.    Are you aware of whether that was still happening?  Did Terence explain that to you?

A.    No.  He just asked me to get there as soon as possible.

Q.    Were you able to pick him up?

A.    Just as I was leaving to pick C.B. up, my brother was coming down from Yonkers on the highway.  He said to stay at work if I can't leave, and he will go and pick up C.B.  He said that he could get to C.B. first.

I told my brother to get there first and to find out what was going on.  And I asked my brother to let me know what was happening.  I would go over there as soon as I could.

Q.    Just to be clear, we are talking about your brother Jose?

W. MUNOZ

A.    Yes.

Q.    Then what happened?

A.    He got there.  C.B. was calm.  Everything went well, and he took him home.  They did ask that I communicate with them and contact them to find out exactly what happened there.

Q.    So did you talk to anybody other than Terence about the incident on May 17th of 2017?

A.    I don't remember if it was that day.  But I made a follow-up phone call, and I requested a meeting.  I spoke to Yissenia to set up a meeting with her.  The day of the meeting was not the same day as May 17, 2017.  I want to say that it was -- the meeting was within a two- or a three-day window.

Q.    The meeting was with just Yissenia?

A.    No.  It was with Yissenia and with Terence, and with the staff member that he bit.

Q.    Sorry.  I can't recall what you said.

      Your brother Jose showed up to pick up C.B.  Did you also go to Lifespire?

A.    No.  There was no need for me to go.  No.

Q.    When did you meet up with C.B. that day?

A.    After work.

Q.    What time was after work?

A.    8:00 P.M.

158

W. MUNOZ

Q.   Then looking at 777, there is a signature for Jonathan Rodriguez.  Does that name ring a bell?

A.   Never heard of the person before.

Q.   Let's talk about May 30, 2017.  Just walk me through the day.

A.   That day, my car was down.  So, I called my boss early during the day, and I told her I would be late.  I was working in the evening to do home visits, and I did not know when my car would be ready.

Q.   Is that a shift in your tour?

A.   We don't have tours.  We just have hours.  So, she said, okay, no problem.  By 1:00 P.M., I still hadn't heard from the mechanic, and I was waiting and waiting.

I said I'll go out tonight in the evening to make visits, but between 5 and 6 o'clock that evening, I received a call from the after-school program that C.B. was trashing the room.

In fact, I had spoken to Terence earlier when he first got there, and he said everything was fine.  I told him the letter they needed was in C.B.'s backpack proving that he had clearance to go back to the program.  Terence said, fine.

Later on, I get a call that C.B. was not safe to transport.  He was throwing things and throwing staplers and attempting to hit people.  He was moving from room to

W. MUNOZ

room.  They were trying to isolate him or contain him, so he wouldn't throw anything else.  They wanted me to come pick him up.

Q.    When you said that earlier that day you talked to Terence about the letter C.B. had with him, how did you talk?

A.    By phone.

Q.    Are you aware of how C.B. had gotten to the after-school program that day?

A.    Yes.  The public school was authorized to take C.B. to the after-school program.

Q.    Did he get there by bus?

A.    Yes.  By bus.

Q.    Then what happened?

A.    Well, then, I told the after-school that they have got to give me a little time, because I do not have a car.  I would have to take a cab from where I am to where they are.  They said, okay.

As I was getting ready to go pick up C.B., they kept calling and calling.  I told them that I was getting there.  C.B. was getting agitated, I guess, at the program. I was saying to them that I am in a cab, and that I was on my way.

This location is near a train rail and it is near an emergency room.  And as I pull up on a single street,

W. MUNOZ

there were cops and EMT, and the cab couldn't get into the block.

I got out of the cab and walked half a block. The setup of this place is like a warehouse.  So, everyone was on the ground floor which is where all the after-school program students are kept.

I past through all cars there.  I went into the warehouse.  And first thing I saw was a sea of cops in a semicircle, and C.B., was sitting to the left handcuffed tn his back, and I saw an EMT worker standing next to him.

Q.    Handcuffed to the back?

A.    Rear-cuffed.

Q.    Were the cuffs attached to an object?

A.    No.  Rear-cuffed.  He was rear cuffed.  And I walked in, and I asked anyone that would hear me, or I walked to one of the staff or they walked over to me.  And, they said:  "This is the parent."

But they were having a conversation among each other.  I don't know if they heard me.  I said: "Excuse me, who is in charge here?"  I saw someone with a white shirt looking looking at me.

This lady officer, who at the time I didn't know her name, said:  "I'm in charge here."  Later on, I found out it was Officer Henry.

I said:  "Look.  I'm C.B.'s mother, and I came to

pick him up.  They told me he wasn't stable to take home.  I came to take him home.

She looks in the direction where my son was at and told me that I can't make that decision.  That decision is up to the EMT, not up to us.

I said, okay.  And, I walked to the EMT lady.  I didn't get her name at the time.  I asked her, I said: "Look.  They told me to talk to you about getting him home.  I was coming to pick him up to take him home."

She said he has to go to hospital.  I said, "Why?  He is calm and just sitting there in the chair."  At that time, Jose comes in, and he's standing and talking.

Q.    Why did Jose come separately?

A.    As I was getting into the cab, he called me, and he says, "Where you at?"  I said on way to after-school.  He had incident there.  Are you close?

He says, "I'll meet you there."  Since, I did not have a car, he was going to transport me home.  He showed up.  We didn't know Lifespire called the police or the EMT.  We were just going to pick C.B. up.

Q.    You had conversation with your brother, Jose, as you were getting into the cab?

A.    I was out of the cab already, and I was walking towards the building.

Q.    When you were approaching, you didn't see the

W. MUNOZ

police cars or ambulances?

A.    I stated previously that, as I approached with the cab, there was cops and ambulances there in the front of the warehouse.

Q.    You mentioned that you said when you spoke to Jose you said something to the effect of:  "We didn't know they were going to call these people or that the cops would be there."

A.    Sorry.  I misspoke.  What I am saying is that when I got out of cab, he happened to call.  And I told Jose that I was approaching the after-school program, and that they had called asking me to pick C.B. up.

He said that he would come to the after-school program because I did not have a car, and he would pick me up.  As the cab that I was in approached the warehouse of the after-school program, I observed that the cops were there when I approached.

Q.    How did that make you feel?

A.    I didn't know whether they were there for him or not.  I was not upset, because they could have been there for another kid.  I don't know whether it was for him. There is a lot of special need kids there.

Q.    Has that happened before when you show up, are other cars there or EMS or police there?

A.    I never had to go to the after-school program,

W. MUNOZ

because they have a private bus.  They would transport C.B. home.  So, that I can recall, I have never been told of any incidents, because my son hasn't been involved in any previous incidents nor gotten hurt there.

Q.    So, you were talking to the female EMT.  Is that right?

A.    Yes.

Q.    Then, what happened?

A.    Well.  I was asking her to have my son released, because he's calm.  He wasn't being arrested.  So, there was no need for him to be in handcuffs.  I was called and told to come take him home.  That was it.

She said, no.  She said he needed to go to the hospital to get evaluated.  I said that there was no need for that, because he has an appointment with his doctor on Friday, and he will get the evaluation then.

She said that doesn't matter.  He has to go to the hospital to be evaluated.  I said I am refusing medical services for him.  At that point, the male EMT asked me whether he could speak to me.

We went passed everyone in the warehouse.  He was telling me that he wanted me to have him go to the hospital.  He thought it was a good idea, because the program probably wasn't going to take him back unless he has a letter clearing him to go back.

W. MUNOZ

I told him, I said: "Listen. I am his mother. And I have the right to take him home unless it is an emergency that requires that he goes to the hospital."

I believe I have discretion to take him home, and I can get him evaluated by his own doctors. With me having supervised people with mental health issues, I know that, unless it is a dire emergency, especially with a minor, most of the time you can refuse services.

He had an appointment coming. I wasn't sure exactly what happened at that point with him at the program. But I know he wasn't physically hurt, and he was calm at that point, so there was no need for him to have been in handcuffs. I know he was very scared.

Q.    How could you tell?

A.    He kept looking at me. His eyes were a little buggy. He felt better when he saw my brother. But what does an autistic kid know about being handcuffed?

He doesn't know anything about that. So, anyway, as I am speaking with him, visually, I see two officers grab my son from the back. He's rear cuffed. They come from the back, and they swoosh him out of his seat. He almost fell on the floor.

Q.    What does swoosh mean?

A.    Meaning they forcefully put their hands between his rear-cuffed arms and put their arms under his shoulders

W. MUNOZ

and tried to lift him.

But he's a very big young man.  And, as they did that, my brother who was there -- I guess was looking at him.  He allowed them to do it.  I guess he had no choice.

They lifted up C.B. and quickly dragged him out of the building.  At that point, everyone left.

Q.    You said there were two officers who did that?

A.    That I saw -- was two officers.  Could have been more.  I am not paying attention to the officers.  The EMT worker was still speaking to me, and I guess that was their tactic to get me away from my child at the time that they were taking him.  He took me quite far from where they were with my child.  Then, they took him outside.

Q.    Back to the two officers that you believe were the ones who picked him up, was one of them whom you referred to previously as the person in the white shirt?

A.    No.  That was the lieutenant.  He wasn't there.

Q.    Were the two officers, to the best of your recollection, male or female or both?

A.    Males.

Q.    They were two males?

A.    Yes.

Q.    Were they in uniform?

A.    Yes.  They were in uniform.

Q.    You are not referring to either EMT as having

W. MUNOZ

been the ones who were grabbing and lifting him.

A.    I wasn't sure of the EMT; because, again, my sight was not on C.B.  It is on the EMT standing directly in front of me.  Maybe, I caught a little glimpse of what's happening.  From my left eye, I watched them drag him out of the building.

Q.    When you say dragging?

A.    They lifted him forcefully and dragged him literally out of the building.  His feet weren't walking. They were like dummy dragging him.  I couldn't tell.  They went fast.  I know he wasn't walking.  I know that I saw he wasn't standing straight up.

Q.    When you say dummy dragging, were his feet sliding behind him?

A.    I didn't see that.  But I know he wasn't standing straight up as he was leaving the building.

Q.    Continue now with what happened.

A.    At that point, I was upset.  But I didn't do anything, because I know he was with family.  My brother was there.  There was no one left inside the warehouse.  I said whatever is going on outside, I will let my brother deal with it.  Staff was also there.  I trusted the staff at Lifespire, Terence and Yissenia.  I knew that nothing would happen to him outside.

Q.    Were Terence and Yissenia on the scene?

W. MUNOZ

A.    Yissenia, yes.  Terence, I don't recall.

Q.    When you got there, where was Yissenia?

A.    She was standing off on my right with other students that were there; and, thereafter, I didn't see her again.

Q.    Did you talk to her when you were there?

A.    No.  I didn't.  I spoke with another staff who directed me to the officers.

Q.    Is that a female or male?

A.    Female.

Q.    Was that a female staffer that you had talked to before?

A.    No.

Q.    You didn't recognize her?

A.    No.

Q.    Then, at some point, did you see Yissenia walk outside?

A.    I don't recall.  I don't remember seeing her walk outside.  I don't recall her after that.

Q.    A minute ago you were explaining kind of your thought process when your son was taken outside.

        Were you under the impression that Lifespire staff was outside?

A.    Everyone left the warehouse.  When I first walked in, there were still students in the building.  There were

W. MUNOZ

a lot of staff.  To the left and center, there were all the cops and the EMT, and my son sitting in a handcuffed chair. By the time C.B. left the building, everyone left the building.  I was the only one left with the EMT.

Q.    They exit, and do you keep talking to the EMT?

A.    Yes.

Q.    What did you talk about at that point?

A.    Continued with the conversation about why I won't let C.B. go to the hospital to get evaluated, what my reasons were for that.

Q.    How long was this conversation?

A.    Maybe about less than two minutes.  And within that two-minute period, Officer Henry comes inside, and briskly walks in, and tells me: "Your son is going to the hospital.  You don't have a choice."

I said to her, I thought you had nothing to do with this.  I thought you said it was up to the EMT to make the decision whether or not he's released.  I asked her to let me continue speaking with the EMT.  She got upset, and she briskly left.

I still stood there talking to the EMT.  I said, let's go outside and continue the conversation outside, because I wanted to know what was going on with my son.

At that point, when I get outside, there is a lot of police officers on the sidewalk, and there are a few in

169

W. MUNOZ

front of the ambulance.  And, an EMT worker is attempting to get my son up on the ambulance.

Q.    This is a different EMT than the one you had been speaking to.

A.    Right.  This was the female EMT officer.  She had been attempting to get C.B. on the ambulance there.

Q.    Was she the only one trying to get him up?

A.    Yes.  I walked through, and I -- with my son while he was handcuffed, I put my left arm through his right arm, and I was trying to get him up.  So, then both of us were trying to get him up.

I'm still talking to her and telling why is this necessary.  Please release him, because he has an appointment for Friday.

She is saying, no.  He needs to go now.  Going right there to Jacobi.  It will be quick.  He will see someone and he will be released.

I said that was a waste of time, and I said that I was only asked to pick him up.  He had no injuries on him, and I had a doctor's appointment scheduled for Friday.

At that point, the male lieutenant was standing behind her, and he was just looking.  He didn't do anything.  At that time, as I was speaking to her -- my son is autistic, and he is very heavy.  I guess he did not know how to maneuver his foot on the ambulance step, which by

170

W. MUNOZ

the way, is a very deep step.

He went to put his foot back up.  I don't know if he lost his footing, but he came back down to the floor. He had been up one step.  But I think he was trying to get up on the other step, and, then, he came down and put both feet on the ground.

At that point, I was still speaking to the EMS worker, and the officer comes to me, and she tells me pretty much that I was done speaking to the EMT and that I was now under arrest.

Q.    Do you know what officer that was?

A.    That was Officer Henry.

At that point, when I looked up, I saw my brother that was in the ambulance, and I am not sure at what point he got into the ambulance.  He was in the ambulance.  He assisted or continued to help C.B. get on the ambulance. He stood with him there.  And he went with him to the hospital at that point.

Q.    You mentioned that you were walking out of the building with the male EMT with whom you had been speaking.

Then you said you walked through to the ambulance.  What were you walking through?

A.    Just the warehouse.  It's probably the equivalent of -- I don't know, maybe, I can't tell you feet.  It wasn't that far maybe fifteen or twenty steps.

171

W. MUNOZ

I didn't go through anything.  It was just going through the warehouse and on the sidewalk.  And then in the street.  That was it.

Q.    You mentioned that you kind of hooked your arm under C.B.'s arm.  Is that fair?

A.    Yes.

Q.    You helped him step up.  And, then, did you let go at that point?

A.    No.  The officer took my arm out of his arm and handcuffed me.

So, I had my arm under his arm pulling him up.  She came and took my right arm, and she twisted my arm, and she started to arrest me.  So, I had no choice but to take my left arm out from under his shoulder.

Q.    At what point had you hooked your left arm under C.B.'s right arm in order to help him up the ambulance step?  I believe you testified a few minutes ago that he looked like he was almost falling and that he took a step and wound up back on ground.

A.    I believe -- I don't think he knew how to navigate the high step.  He might have been trying to back up a little bit, and then to put his foot up.  He may have lost his footing.  He may have put his right foot back down and his left foot back down in order to attempt to go back up.

DIAMOND REPORTING   (877) 624-3287   info@diamondreporting.com
171

W. MUNOZ

Q.    While he was putting his right foot down and his left foot down, were both feet on the ground outside the ambulance?

A.    Yes.  He was outside the ambulance.  He hasn't gotten into the ambulance or in the back of the ambulance yet.

Q.    When describing the back of the ambulance, is that also known as a bus?

A.    Right.

Q.    Is that when you see that both doors of that back ambulance is open?

A.    Yes.

Q.    There was a sidewalk that ended right where the ambulance started?

A.    No.  Because they were in the middle of the street facing up a slight ramp.  Sometimes an ambulance backs up to a sidewalk, but that did not happen.  The street was in an upward slant, and the ambulance was in an upward slant itself.

Q.    There was one step?

A.    Yes.

Q.    There was a second step?

A.    Yes.

Q.    The second step was level with the inside of the ambulance?

W. MUNOZ

A.    Good question.  I can't remember.

Q.    At the point that you first approached your son and put your arm under his right arm --

A.    Yes.

Q.    When you first did that, where was his foot?

A.    One foot was trying to get up onto the step.

Q.    Was he mid-stepping onto step one?

A.    I can't recall at this time which step it was. It was probably step one.  I can't remember.  It was a step he was trying to get up onto.

Q.    When you describe him going backward, was your arm still hooked under his arm when that happened?

A.    Yes.  My arm was still under his arm.

Q.    How much time did all this take?

A.    Mere seconds.

Q.    To the best of your recollection, was anyone around you at that point?

A.    The EMT.  All the cops were there.  All the officers that came on the scene.  My brother was there, and the EMT worker was there, and the lieutenant was there, and the arresting officer was there.

Q.    Where were they in relation to where you were?

A.    I am not sure how to calculate that, maybe, from here (indicating), to the door.  Maybe ten or twelve feet.

Q.    Let's say if you were standing here at the end of

W. MUNOZ

this table where the stenographer is seated, and has been diligently all day taking down what we say, so from the end of this table.

A.    To the door to the conference room?

Q.    Yes.

A.    What is that distance?

Q.    Yes.  Was that as far away as the police were?

A.    Yes.  Because, it is a very small narrow street. Two cars couldn't pass each other, or one would have to slow down so that the other could pass.

Q.    Before Officer Henry touched you, were you aware of where she was in relation to you?

A.    No.  Not at all.

Q.    Do you recall where she was?

A.    I have no idea where she was.

Q.    Where was the female EMT in relation to you when you hooked your arm under C.B.?

A.    Her and I were both assisting him get on the ambulance.

Q.    Did she have the other arm?

A.    She did.

Q.    At some point, there from the end of the table that we talked about to the door, estimating steps, let's say it was ten feet.  From that distance, were you able to see anything that was going on inside the ambulance at the

W. MUNOZ

Q.      Had anyone indicate to you that they had not double locked the cuffs?

A.      No.  But I didn't know that.  Even from the time that I saw him handcuffed to the time that I got arrested, I never knew how he was handcuffed.

But me seeing him in that position led me to believe that maybe his handcuffs were too tight, and he couldn't physically maneuver his body to get onto the ambulance.  If the cops were there, why didn't they help him up onto the ambulance?

Q.      Are you alleging that the handcuffs were too tight?

A.      I am not sure, so I am not alleging that.  I am not sure what happened.

Q.      Did you have any indication that C.B.'s wrists were injured when he was put into the ambulance?

A.      No.  I will tell you that when I got home, I did see the imprints, deep imprints, of the handcuffs.  It could have been too tight to begin with.  Or, if as they were trying to restrain him, they put the handcuff on wrongly which can break your wrist.  But he did not have a broken wrist.

Q.      Roughly, how long after the phone call that you received to go pick up C.B., did you show up on scene?

A.      It was fifteen or twenty minutes later.

W. MUNOZ

Q.    In those fifteen to twenty minutes, you received multiple calls from Lifespire?

A.    They were very very anxious.  They wanted to know how fast I was coming.

Q.    Did you pick up the phone each time?

A.    Every time.

Q.    Was it the same person calling you?

A.    It was two different people.  But I don't know who it was.  Yissenia was one of them.  I don't know who else was calling.

Q.    Was it a female or a male?

A.    One female and one male.

Q.    Did they indicate to you that the situation was escalating?

A.    They didn't say that.  They were more concerned with how soon I was getting there.

Q.    Were you under the impression the situation was escalating?

A.    Yes.

Q.    From the time that you walked into the front door of Lifespire to the time that you were arrested, how much time elapsed?

A.    Less than ten minutes.

Q.    How soon after you arrived on scene did your brother Jose Munoz show up?

W. MUNOZ

A.    Five minutes after I arrived.

Q.    So, did you walk into Lifespire with him?

A.    No.

Q.    At any point, did someone tell you that they had called the police, one of the staffers?

A.    No.  Not until I arrived, and I saw them there did I know that.

Q.    You said that you were upset when you saw what was going on?

A.    Yes.

Q.    How did you communicate that upset, if you did, to anyone?

A.    I didn't.  Well, actually what I did was -- I asked.  When I spoke to the EMT, I asked her:  Why are you keeping him?  That was my level of frustration.

When NYPD said they had nothing to do with it and that I had to speak to EMT, I went to EMT to ask what was going on.  Why is he still in handcuffs?  He is okay now. He is calm.

Q.    What tone of voice were you using when you asked?

A.    Same as I have now.

Q.    Same as for this entire deposition?

A.    Yes.  The same.

Q.    You didn't elevate your voice?

A.    That is just not my style or not my MO.  And I do

180

W. MUNOZ

not work with people in that capacity ever.

Q.    At any point, do you recall using profanity?

A.    No.

Q.    After you were placed in handcuffs, were you transported to the precinct?

A.    Yes.  They transported me to the 49th Precinct.

Q.    How did you get there?

A.    By car.

Q.    Was it a marked or unmarked vehicle?

A.    Marked.

Q.    Do you recall how many officers were in the car with you?

A.    Two.

Q.    Roughly, how long was that ride?

A.    Less than five minutes.  It was across the street from the after-school program.

Q.    Do you recall the gender of the two officers that were there?

A.    One female and one male.

Q.    Was one police officer that same Officer Henry?

A.    Yes.

Q.    Who was driving?

A.    The male officer was driving.

Q.    What kind of marked vehicle was this?  Was it the kind with a cage?

W. MUNOZ

A.    Yes.

Q.    Do you remember the name of the officer who was driving?

A.    No.

Q.    So, when you got to the precinct, what happened?

A.    Immediately, they put me in a cell.  They put me in the cell right away.  To be honest, I was scared, because I had never been arrested before in my life.  I never had any contact with a jail other than me placing people in jail.

I worked with precincts and officers and detectives all the time.  And I never had sat in a cell. So, I sat there and waited for them to come to speak to me.

Q.    Were you searched when you got to the precinct?

A.    I was searched.  Yes.

Q.    Who searched you?

A.    Officer Henry.

Q.    After that, she put you in a cell?

A.    Yes.

Q.    Were you fingerprinted?

A.    Not right away.

Q.    Were you photographed?

A.    Not right away.  But yes.  I was photographed.

Q.    You were put in a cell before those things happened?

W. MUNOZ

A.   Yes.

Q.   When Officer Henry searched you, can you walk me through what she did?

A.   She pat me down and checked for any weapons or anything.

Q.   Did you have your gun on you that day?

A.   No.  Because what I was going to do was pick up C.B., and then, I was going to go home and get dressed for work.

I was coming back to my home, so there was no need to take my work equipment.  I didn't know that I was going to be arrested.

Q.   Did they find out at some point that you were law enforcement?

A.   Yes.  After my brother took out my shield from my pocketbook and, at some point at the precinct, the lieutenant had my shield and my driver's license and my job ID.

Q.   Would that have been back on the scene before you got to the precinct that the shield came out?

A.   I only took it out when they arrested me for ID purposes.  But that was it.

Q.   When Officer Henry searched you, where did she search you?

A.   High-risk areas where we usually search which is

W. MUNOZ

your waist and regular areas where you're supposed to search a person.

Q.    Are you familiar with the 49th Precinct?

A.    It is not a precinct that I cover, but I am aware of it.

Q.    Where, physically, in the 49th Precinct did she search you?

A.    Inside a cage where they photograph and print you.

Q.    So, you were searched before you were put into a cell.  Is that right?

A.    Yes.  They put you inside an area, a secluded area.  Then, they search you.

Q.    Was anyone else there?

A.    I don't recall.  At some point, I was alone with her.  It wasn't in the very beginning.  There was an officer there sitting on the computer.  The other officer that came he walked out, and someone else was at the computer.

Q.    Did you recognize the person at the computer as someone that had been at Lifespire when you were arrested?

A.    No.  I don't remember.

Q.    You referred to another other officer coming in and out?

A.    The arresting officer, that drove us there, he

might have gone out for a second leaving me with other officer.

Q.    On the way to the 49th Precinct, did you talk to either officer in the car?

A.    No.

Q.    There was no conversation?

A.    No.

Q.    What about when you were in the cell with Officer Henry?

A.    Yeah.  I spoke with her.  I asked her what am I being charged with and what's going on.  I wanted to call my boss.  I asked her tons of questions.  She didn't speak a lot.  She was just trying to process me.

Q.    When you were asking all these questions, had you already been fingerprinted?

A.    No.

Q.    Had you been photographed?

A.    No.

Q.    Roughly, how long had you been there before those things happened?

A.    A few hours probably.

Q.    In the interim what, if anything, happened?

A.    Well, I'll tell you what happened.  I was there a while, and I kept asking to make a phone call.  In the meantime, she said a detective from upstairs wanted to

W. MUNOZ

Q.    How did you get home?

A.    I had to take a cab.

Q.    Is that where you went after you got released?

A.    Yes.

Q.    What time did you get home?

A.    It was some time after midnight.  I don't remember.  It could be closer to 1:00 A.M.

Q.    How far is your home from the 49th Precinct?

A.    I would say maybe four miles.

Q.    When you got home, who was there?

A.    Kids were there.  The kids were there, and my brother was there.  My babysitter was there.  That's it.

Q.    Remind me.  Is this the babysitter who left in June of 2017?

A.    Yes.

Q.    Ms. Conce Ovalle?

A.    Yes.

Q.    Was C.B. awake?

A.    No.  He was sleeping.

Q.    Was your daughter awake?

A.    Everyone was sleeping.  They didn't know what time I was coming home.

Q.    What did you do when you got home?

A.    Well, besides the kids, the adults woke up.  And I started talking with my brother about what happened with

W. MUNOZ

C.B. at the hospital.  I was asking whether he was okay.

He said, as soon as they were seen, they were seen and released within a half-an-hour.  He said that, after they were seen, C.B. was fine.

Q.    I would just like to go over some of your previous testimony just to make sure that it is clear.

I am turning back to the beginning of the evening on May 30th of 2017.

You took a cab to 1315 Loomis Street.  Is that right?

A.    Right.

Q.    You show up there, and as you are getting out of the cab, you talk on the phone with your brother, Jose.  Is that right?

A.    Yes.

Q.    You see police cars when you show up?

A.    Yes.

Q.    Do you see an ambulance as well?

A.    Yes.

Q.    How many police cars do you remember seeing?

MR. SIMPSON:  Objection.

A.    Could have been maybe three or four cars.

Q.    How could you tell they were police cars?

A.    They were clearly marked.

Q.    Marked vehicles?

W. MUNOZ

A.    In another direction.  He pulled me farther back towards the warehouse as opposed to where everyone else was.

Q.    Was anyone else standing around when you were talking to him?

MR. SIMPSON:  Objection.

A.    No.

Q.    Then, while you were talking to him, at that point two police officers picked up your son as you described it and dragged him out?

MR. SIMPSON:  Objection.

A.    Yes.  I couldn't see if there were more people, because the EMT worker was standing directly in front of me.  So, I only saw a bit, cutting my eye to the side of where they were, and from the left side, I saw them leaving the warehouse.

Q.    From what you could see, was there one officer holding C.B. by the right side, and another officer holding C.B. on the left side?

A.    There were two officers holding him.

Q.    Walking next to him or behind him?

A.    Next to him.  And, then, there were other officers around this.  This happened in less than ten seconds.  There were people moving around.  I don't know if one let him go or whether they continued to have two there.

W. MUNOZ

They all briskly left the building together.

Q.    As they left the building, were you able to see with certainty what C.B.'s feet were doing?

MR. SIMPSON:  Objection.

A.    No.

Q.    How long was he outside before you stepped outside?

MR. SIMPSON:  Objection.

A.    Maybe five minutes or so.  Could have been ten minutes, but it was no more than ten.

Q.    You remained inside the warehouse talking to the EMT for five to ten more minutes while everybody was outside?

A.    Yes.

Q.    Then when you left the warehouse, you went straight to C.B.?

A.    Yes.

Q.    At that point, when you approached him, were both his feet on the ground?

MR. SIMPSON:  Objection.  Asked and answered.

A.    No.

Q.    Was his left foot on the ground?

A.    Left foot.  Yes.

Q.    Was his right foot stepping onto the first step.

W. MUNOZ

arrived to the time you were taken to the 49th Precinct,

that at no time did you ever raise your voice?

A.    No.

Q.    At no point did you swear at anyone?

A.    No.

Q.    At no point did you act in an aggressive manner?

MR. SIMPSON:  Objection.

A.    No.

Q.    I'm looking at 16 lines down.  It says:

"The police arrived."  And I'm sorry -- I can't

read it well.  "The police were not able to control C.B.

They tried to tell him" -- I actually cannot read it.

"He continued to act violently towards the cops

who at this point put him in plastic cuffs to control him."

Is it your testimony that he was in metal cuffs

or regular ones if you recall?

A.    If I recall, he was in metal cuffs.

Q.    Do you remember for sure?

A.    I don't remember for sure.

Q.    Next line:  "When mother arrived, she got

infuriated that cops had him in cuffs.  C.B. was put in an

ambulance."

"C.B.'s mother became unruly, and tried to

intervene with the cops' job."

At any point, did you behave in a way that might

W. MUNOZ

be considered to be unruly?

MR. SIMPSON:  Objection.  Asked and answered several times.

A.    No.  I was not unruly.  I did not raise my voice. I did not curse at these people.

Q.    If anyone were to testify to the fact that you had raised your voice or used profanity at some point while you were out there, would they be untruthful?

MR. SIMPSON:  Objection.

A.    Yes.

Q.    Following what we discussed earlier, that after your meeting at work, your gun was taken away, how did that affect your work schedule?

A.    It affected it a lot.  I was placed in a very precarious position at work.  I couldn't go to the field. I couldn't go to court.  Pretty much, I was office-bound when my weapon was removed.

Q.    Was your salary deducted at all?

A.    My base salary was not deducted from at all, but my chance of getting overtime was severely cut.

Q.    How long was it that you went without overtime?

A.    It was months from about three-and-a-half months.

Q.    Were you arraigned in connection with that DAT on August 1st of 2017?

A.    Yes.  That was the first arraignment.

W. MUNOZ

Q.    Was that the first time you had to appear in court with the DAT issued on May 30, 2017?

A.    I believe I had a hearing before that.

Q.    Before August first?

A.    No.  August 1st of 2017, that was the date.

Q.    Did you have to appear in court any other times?

A.    No.

Q.    Did you go to the district attorney's office?

A.    Yes.

Q.    With whom did you meet at the DA's office?

A.    I have it in writing, but not with me right now. It was the supervisor district attorney.

Q.    Who else was at that meeting?

A.    The supervising district attorney, the district attorney, and my attorney.

Q.    When you say the district attorney, can you describe that person?

A.    She was the DA on the case, and, then, her supervisor, my lawyer, and myself.

Q.    Was C.B. present?

A.    No.

Q.    Anybody else present?

A.    No.

Q.    Then, what did you guys talk about?

A.    We discussed my case, and he instructed the

W. MUNOZ

district attorney to dismiss the case. They apologized, and they said that case should have never come to court.

Q. When was the case dismissed?

A. It was dismissed two or three days later, or it could have been a week after that it was dismissed.

Q. So, you never had to go to court again?

A. No.

Q. You went one time in connection with this case?

A. Yes.

Q. Let me ask you, would C.B. be able to testify during a deposition?

A. No.

Q. Is that in connection with what you have described as his developmental diabilities?

A. Yes.

Q. Do you anticipate C.B. could testify at a trial if this case goes to trial?

A. He will talk about Sponge Bob and cartoons but I doubt that he will be able to recall anything of that incident.

Q. Has CB been affected in your opinion by the incident that occurred on May 30th of 2017?

A. Yes.

Q. How did that manifest itself?

A. It was at first -- he really did not want to go

212

W. MUNOZ

to school.  He did not want to leave the house.  He did not want to get up or take a shower which caused him to have a lot of days off.  When he was seeing the police, he would get nervous thinking that they were going to handcuff him.

Q.    How could you tell?

A.    Because any time you would hear sirens outside, he would just -- I could tell as a parent.  His attention would go towards the window.  If he saw the police outside, he would walk far away from them if he saw them.

Q.    How long did that go on for?

A.    That was maybe two or three months.  Then, he would forget about it for a while.  When we had to think of going back to school, that kind of helped him a bit.

Q.    Has he seen anyone who diagnosed that any his symptoms were directly affected by what happened on May 30, 2017?

A.    No.

Q.    Are there any other damages that you are alleging that we haven't discussed?

MR. SIMPSON:  Objection.

A.    What do you mean?

Q.    By damages, I mean financial repercussions that you have suffered?

A.    Loss of overtime.

Q.    Is there anything else that we have not