Index No. 17 Civ. 9583 (LAK) (DF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WANDA MUNOZ, individually and as next friend to minor child C.B.,

                                        Plaintiffs,

                    -against-

CITY OF NEW YORK, a municipal entity, P.O. KATHY HENRY, P.O. RAINARD WROTEN, LT. RYAN PIERCE, P.O. ROAN LEWIS, P.O. JAMES FICO, P.O. JONYA MCDOWELL, P.O. ANTONIO LOMEDICO, P.O. KENNETH WOISIN, EMERGENCY MEDICAL TECHNICIAN ERNESTO MEJIA, EMERGENCY MEDICAL TECHNICIAN BRUNY ORTEGA-GARCIA, JAMES P. O'NEILL, as Commissioner of the New York City Police Department, DANIEL A. NIGRO, as Commissioner of the New York City Fire Department, sued herein in their official and individual capacities,

                                        Defendants.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

*JAMES E. JOHNSON*
*Corporation Counsel of the City of New York*
*Attorney for Defendant City*
*100 Church Street - Room 3-169*
*New York, NY  10007*


*Of Counsel:  Elissa Fudim*

*Tel:  (212) 356-2335*

## TABLE OF CONTENTS

1. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL OF MUNOZ'S
   CLAIMS ................................................................................................................. 1

   A. There Was Probable Cause, Or Arguable Probable Cause, For  Munoz's Arrest ............ 1

   B. Munoz's Failure To Intervene Claim Fails  ........................................................ 4

   C. Munoz Has No Claim For Malicious Prosecution ............................................. 5

2. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL OF
   C.B.'S CLAIMS   ..................................................................................................... 6

   A. Transporting C.B. To The Hospital Was Privileged, Or Arguably Privileged, Under
      The Mental Hygiene Law ..................................................................................... 6

   B. Defendants Had Probable Cause, Or Arguable Probable Cause, To Arrest C.B.  ............ 9

3. PLAINTIFFS HAVE NOT ESTABLISHED MONELL LIABILITY FOR C.B.'S
   HOSPITALIZATION   ............................................................................................ 10

4. PLAINTIFFS HAVE NO FOURTEENTH AMENDMENT CLAIM ........................................... 14

CONCLUSION ............................................................................................................. 15

**1.      Defendants Are Entitled To Summary Judgement on all of Munoz's Claims.**

A.  <u>There was Probable Cause, or Arguable Probable Cause, For Munoz's Arrest.</u>

Munoz claims that summary judgment should be denied on her false arrest claim because there is a "web of disagreements" as to the nature of her contact with C.B. as he was getting into the ambulance. Plaintiff's Memorandum of Law ("PMOL"), at 4. These discrepancies, she argues, create "a sharp factual dispute over whether Munoz committed any physical act that could constitute OGA". <u>Id.</u>, at 14. Plaintiff is wrong. The discrepancies among defendants' testimony[1] do not save plaintiff from summary judgment because Munoz admits that (i) she was present behind the ambulance, (ii) she placed her left arm through C.B.'s right arm as C.B. stepped up into the ambulance, and (iii) as a result, C.B. came off the ambulance. Defs' Response/Reply to Statement of Material Facts ("RSMF") at ¶¶ 68, 71.  <u>Evans v. Stephens</u>, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) ("When the non-movant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the non-movant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the non-movant."); <u>Krynski v. Chase</u>, 707 F. Supp. 2d 318, 327 (E.D.N.Y. 2009); <u>Berk v. St. Vincent's Hosp. & Med. Ctr.</u>, 380 F. Supp. 2d 334, 346 (S.D.N.Y. 2005). Thus, all the cases to which Munoz cites for the proposition that for OGA, "[t]he interference must at least in part be 'physical' and cannot consist solely of verbal statements" (PMOL, at 13) are immaterial; there is no dispute that Munoz's acts were physical – she described them as such herself.

Officer Henry, who arrested Munoz, saw Munoz engage in this conduct. RSMF at ¶¶ 68,

---

[1] These discrepancies are minor and are not surprising considering that more than twenty officers responded to the scene (Second Amended Complaint at ¶33) and the defendants were not viewing the events from the same vantage point – never mind, that these depositions were taken about two years after the incident.

70, 73, 99.[2] While Munoz does not dispute that Officer Henry observed her interaction with C.B., she argues that Officer Henry did not arrest her because of it.  Rather, Munoz contends Officer Henry arrested her for simply "yelling and screaming", which Officer Henry erroneously believed was lawful.[3] PMOL at 13-14. Id. Not so. First, Munoz mischaracterizes Officer Henry's testimony. Officer Henry did not testify that she believed she could arrest Munoz for OGA for simply for yelling and screaming. RSMF at ¶ 98.[4] Second, there is no evidence that Officer Henry arrested Munoz for yelling and screaming.[5] Moreover, even if Officer Henry had arrested Munoz solely for yelling and screaming (for which there is no evidence), defendants would still

---

[2] Q. Can you walk us through what happened when everyone got the ambulance? A. We got to the ambulance. Now I can't remember if it was EMS or an officer, but they're assisting him into the ambulance. You know, you have to take that step when you walk in. Ms. Munoz goes into the ambulance and takes her son off…" Ex. G (Henry Dep.), 78:11-18; "Q. Ms. Munoz, when you say that she grabbed C.B., where were C.B.'s feet at that time? A. Stepping into the ambulance." Ex. G (Henry Dep.), 81:5-7; "Q. Is it your testimony that when you claim she grabbed her son, he actually came out of the ambulance and had both feet on the ground at that point? A. Yes." Ex. G (Henry Dep.), 84:16-20.

[3] In support of her argument that Officer Henry arrested her for yelling and screaming (and not for her interference with placing C.B. on the ambulance), Munoz notes that the arrest report and criminal court complaint do not reference Munoz pulling C.B. out of the ambulance. PMOL, at 14. She argues that this "suggests that Officer Henry arrested Munoz because Officer Henry was frustrated that Munoz was yelling and only later at her deposition alleged Munoz pulled C.B. out of the ambulance."

[4] "Q. So what's your understanding of what kind of interference a person would have to engage in in order to commit OGA? A: Physically -- have to physically be interfering with us trying to do our duties….Q. Can a person commit OGA by yelling and screaming at an officer? A. What do you mean by that? Just yelling and screaming without anything else, just screaming, just standing there and they're just screaming? Q. …If somebody is yelling and screaming at an officer objecting to an arrest or an act by the officer, yelling and screaming at the officer, does that constitute OGA, if you know? A. I would say it depends on what else -- it depends. There's different factors in that, because -- there's different factors because there's different scenarios. It could be, it could be. It can in different scenarios I've been in where it can. Q. So what you're saying is it's possible for a person to commit OGA by yelling and screaming at an officer trying to perform an official act? A. Possibly." Ex. G (Henry Dep.), at 44:9-45:13. And, indeed, Officer Henry was not entirely wrong; there have been circumstances, where yelling and screaming have been held to constitute OGA. See e.g. People v. Yarborough, 19 Misc. 3d 520, 524-25 (Sup. Ct., Bronx Cty. 2008) (OGA information alleging that defendant stood between police and suspects and yelling at suspects as police attempted to question them was sufficient). But Officer Henry never testified that she believed she could arrest Munoz, in these circumstances, for simply yelling and screaming, rather than an abstract hypothetical of "could it ever be possible".

[5] While Officer Henry was, not surprisingly, less detailed in the arrest report and criminal court complaint than at her deposition, both documents are consistent with her testimony that she saw Munoz pull C.B.'s arm in an attempt to remove him from the ambulance. Officer Henry wrote in the arrest report that Munoz "physically began trying to prevent officers from escorting the child to the ambulance, [and] was told repeatedly to step away and allow officers to do their jobs. [S]he repeatedly refused." Ex. 18. The complaint report stated that Munoz "attempt[ed] to grab emotionally disturbed person's arm to pull him out of the ambulance". Ex. 19. Neither of these documents mentions anything about yelling or screaming as the basis for arrest, or otherwise negates Officer Henry's testimony that she saw plaintiff Munoz pull C.B. from the ambulance.

be entitled to summary judgment, because "an arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime." Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007). Here, given that Munoz admits that (i) she laced her arm through C.B.'s as he was getting on the ambulance, (ii) C.B. came off the ambulance as a result, (iii) Officer Henry was present when this occurred, and (iv) Officer Henry observed this conduct[6] – Officer Henry plainly had probable cause to arrest.

Munoz next argues that her arrest for OGA was unlawful because Munoz did not intend to pull C.B. off the ambulance, but rather, she was actually trying to help C.B. *into* the ambulance. PMOL, at 14. Munoz's argument again misses the mark. This is because Munoz's actual intentions are irrelevant; the relevant inquiry is whether Officer Henry had a reasonable basis for concluding that Munoz intentionally committed OGA. Because an officer cannot get inside the head of a suspect, intent can be inferred from a person's actions and the relevant circumstances. United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002); Hughes v. Lebron, No. 14-cv-9479(PAE), 2016 U.S. Dist. LEXIS 127569, at *22 (S.D.N.Y. Sept. 19, 2016). Evans v. City of N.Y.[7], relied upon by plaintiffs (PMOL, at 13) is not to the contrary.

In Evans, plaintiff was arrested for blocking an intersection with her vehicle. According to Evans, she did not intend to block the intersection, but was caught in the intersection by other vehicles preventing her from moving her car. The Court did not deny summary judgment because, there was a dispute of fact about plaintiff's subjective intent; the court denied summary judgment because assuming the truth of the facts as alleged by plaintiff – that vehicles blocked

---

[6] Whether Officer Henry observed Munoz pull (or attempt to pull) C.B. out of the ambulance once, or more than once (as Officer Henry testified), is not a material issue of disputed fact, because for purposes of this motion, defendants accept as true Munoz's admission that it occurred only once.

[7] No. 12-CV-5341 (MKB), 2015 U.S. Dist. LEXIS 37781, at *3 (E.D.N.Y. Mar. 25, 2015).

plaintiff's car on all sides – the defendant would have seen that as well, and therefore had no basis for believing that plaintiff intended to block the intersection.

Here, Officer Henry observed Munoz grab C.B. as he was going into the ambulance, and saw C.B. step off as a result – something that plaintiff does not dispute. RSMF at ¶¶ at 68, 71, 99.[8] At the same time, Munoz was saying "I am refusing medical services for him" and "[c]ontinued with the conversation about why I won't let C.B. go to the hospital to get evaluated." RSMF at ¶ 62. Based on these circumstances, Officer Henry was certainly reasonable (even if mistaken) in concluding that Munoz was trying to pull C.B. off the ambulance, not assisting him into it. Thus, at a minimum, she would be entitled to qualified immunity.

Yet, in claiming qualified immunity does not apply, Munoz argues: "Several other people testified that they were also physically helping C.B. into the ambulance at the same time, which strongly implies that no officer could have accidentally interpreted [Munoz's] actions as interfering with C.B.'s entry in the ambulance." PMOL, at 16. Munoz's argument is not syllogistic. While several other people may have been trying to help C.B. into the ambulance, that does not mean that Munoz shared their intentions. Lt. Lewis, Officers Wroten and McDowell, and Lifespire staff all believed that Munoz's intent was to pull C.B. out of the ambulance. Qualified immunity applies when reasonable officers could disagree about the circumstances. Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995).  It clearly applies here.

B.  Munoz's Failure to Intervene Claim Fails.

Plaintiff argues that each of the defendants other than Henry (who arrested Munoz) and Fico (for whom Munoz concedes there is no liability), should be liable for failure to intervene on

---

[8] "Q. Can you walk us through what happened when everyone got the ambulance? A. We got to the ambulance. Now I can't remember if it was EMS or an officer, but they're assisting him into the ambulance. You know, you have to take that step when you walk in. Ms. Munoz goes into the ambulance and takes her son off…" Ex. 17 (Henry Dep.),78:11-18 "Q. Ms. Munoz, when you say that she grabbed C.B., where were C.B.'s feet at that time? A. Stepping into the ambulance." Ex. 17 (Henry Dep.), 81:5-7; "Q. Is it your testimony that when you claim she grabbed her son, he actually came out of the ambulance and had both feet on the ground at that point? A. Yes." Ex. 17 (Henry Dep.), 84:16-20.

Munoz's false arrest claim because "all of them saw her being arrested". PMOL, at 31.[9] But, obviously, merely witnessing an arrest is not enough to support a failure to intervene claim.

C.  Munoz Has No Claim For Malicious Prosecution.

Munoz's malicious prosecution claims fail because there was probable cause as set forth above. Point 1.A. Her federal malicious prosecution claim also fails for an insufficient deprivation of liberty because the misdemeanor criminal case against Munoz was dismissed before her first court appearance following arraignment. Rohman v. N.Y.C. Transit Auth., relied upon by Munoz for the proposition that one can suffer a deprivation of liberty when he must "render himself at all times amenable to the orders and processes of the court", PMOL, at 17, does not save her claim. There, the plaintiff had to return to court on at least five occasions over an extended period of time before the charges against him were ultimately dropped, Rohman, 215 F.3d 208, 216 (2d Cir. 2000), whereas here, Munoz's only court appearance was her arraignment. As a way around this problem, plaintiff cites to DeRocha v. N. Syracuse Police for the proposition that loss of employment can support a deprivation of liberty for a federal malicious prosecution claim. That is not the holding of DeRocha. In DeRocha, the plaintiff's prosecution spanned four years and the plaintiff had to appear in Court on more than thirty-six occasions. Id., No. 5:18-CV-1052(GLS/ATB), 2018 U.S. Dist. LEXIS 201434, at *3, *18 (N.D.N.Y. Nov. 27, 2018). In addition, the Court noted, in passing, that plaintiff also lost his job. Id. at *19. The Court did not suggest that the loss of a job, without post-arraignment court appearances, can satisfy the deprivation of liberty requirement for a federal malicious prosecution claim. And, beyond that, Munoz did not lose her job as a result of her arrest – she was moved to desk-duty. RSMF at ¶ 101.

---

[9] Plaintiff further notes that Officer McDowell had "no opinion" as to whether there was probable cause to arrest Munoz. Id. Indeed, that is precisely why there can be no failure to intervene claim as to McDowell. To be liable for failure to intervene, an officer must be aware that there is an absence of probable cause.

5

**2.        Defendants Are Entitled To Summary Judgement on all of C.B.'s Claims.**

Plaintiffs argue that C.B.'s arrest – manifested by his transportation to the hospital as an EDP – was unlawful because (i) C.B. was calm when defendants arrived, (ii) defendants did not witness C.B. doing anything unlawful or dangerous, (iii) there were less intrusive means of restraining C.B. short of handcuffing, and (iv) the EMT defendants violated internal procedures. PMOL, at 18-25. None of these arguments is persuasive.

A.  Transporting C.B. To the Hospital Was Privileged, Or Arguably Privileged, Under the Mental Hygiene Law.

The parties agree that an officer may seize a person for a psychiatric evaluation if the officer has probable cause to believe that the person is dangerous to himself or others. Plaintiffs argue that defendants had no basis to believe that C.B. was a danger to himself or others because at the time they arrived, C.B. was calm. First, this is not uniformly accurate. Officer Lewis testified that C.B. was pacing, screaming, and attempting to throw things when he arrived. RSMF, at ¶ 32. But, even if we assume, for the sake of argument, that C.B. was calm when all defendants arrived, that does not resolve the issue. That is because the law does not require an officer to personally witness the threatening behavior; they can rely upon the statements of others, as well as circumstantial evidence. Jones v. N.Y., No. 16-CV-556 (AJN), 2019 U.S. Dist. LEXIS 163418, at *16 (S.D.N.Y. Sep. 23, 2019) ("In the context of § 9.41, reports that an individual has threatened others or acted aggressively can be sufficient to support a finding of probable cause.").[10]

Here, defendants received a radio call that C.B. was behaving violently, destroying property and attacking staff. RSMF, ¶ 28. Lifespire staff were concerned enough that they

---

[10] Plaintiffs ignore Jones, other than to mention it in a footnote, in which they seek to distinguish it on the grounds that in Jones, staff told police that Jones had a history of making suicidal threats, whereas C.B. was not suicidal. PMOL, at 23, FN 9. But plaintiffs do not explain why suicidal threats are necessary to invoke § 9.41. And, in fact, they are not.

removed the other children from the room and called 911. Id. at 24. The facility's psyche coordinator told defendants that C.B. had been behaving violently, swinging at staff members and destroying property. Defendants were also informed that a week earlier there was a similar incident, where C.B. bit a staff member hard enough to send him the hospital. Id. at ¶ 48. And, littered across the floor were the remnants of C.B.'s rage - a broken table, cabinets with broken and missing doors, a broken karaoke machine, a number of broken phones, and a broken water cooler. Id. at ¶ 22, 36. In these circumstances, the invocation of the MHL was reasonable.

Plaintiffs argue, however, that notwithstanding the above, the EMT defendants are liable for false arrest because they failed to contact OLMC per internal policy. PMOL, at 24-25. This argument is simply wrong. Failure to comply with an internal procedure does not make out a constitutional violation, because procedures do not create legal duties. See e.g. Salim v. Proulx, 93 F.3d 86, 92 (2d Cir. 1996) (reasoning that a police officer's failure to call for backup in violation of procedure did not give rise to liability); Charles v. Falco, No. 16 CV 166 (VB), 2019 U.S. Dist. LEXIS 47235, at *9 (S.D.N.Y. Mar. 21, 2019) ("Even if McNichol's failure to notify C.O. Doswell violated internal rules, that failure does not rise to the level of a constitutional violation."); Walker v. City of N.Y., 367 F. Supp. 3d 39, 63 (S.D.N.Y. 2019) ("to the extent that the Complaint alleges violations of constitutional rights predicated on Defendants' non-compliance with internal policy, those portions of Plaintiff's Complaint do not state a claim").

Plaintiffs also claim that defendants are liable for falsely arresting C.B. because they failed to consider "plainly exculpatory evidence" that C.B. did not require hospitalization as required by Kerman II.[11]  But, there was no clearly exculpatory evidence that defendants failed to consider.  Munoz's "assessment that it would be safe to take [C.B.] home" (PMOL, at 24) was not "clearly exculpatory".  And, there is no evidence that defendants failed to consider it, whereas

---

[11] Kerman v. City of N.Y., 261 F.3d 229 (2d Cir. 2001).

in <u>Kerman II</u>, defendants refused to speak to plaintiff's girlfriend and psychiatrist when they called and asked to speak to the officers. <u>Kerman II</u>, 261 F.3d at 233. Here, faced with conflicting claims – a self-proclaimed assessment by Munoz that C.B. would not be violent if released into her custody, and a report by Lifespire's psyche coordinator that a week earlier, following a similar incident, C.B. had bitten someone hard enough to require hospitalization – defendants erred on the side of caution and took C.B. to the hospital. This was reasonable, and at a minimum, would entitle defendants to qualified immunity.

<u>Kerman III</u>, to which plaintiffs cite in opposition to qualified immunity (PMOL, at 25), does not change that result. In <u>Kerman III</u>, defendants received a 911 call that there was an EDP at plaintiff's address and he possibly had a gun. Upon arrival, defendants encountered the naked plaintiff. They searched plaintiff's apartment, but found no gun. Although they had opportunities to speak to plaintiff's girlfriend, as well as plaintiff's psychiatrist, they did not do so. Instead, they seized plaintiff under the MHL. <u>Kerman v. City of N.Y.</u>, 374 F.3d 93, 114-119 (2d Cir. 2004). The Court, post-trial, and on appeal, found that defendants were not entitled to qualified immunity for this seizure. The Court held "Kerman had a right not to be detained or involuntarily hospitalized by an officer who (on Kerman's version of the facts) did not know, and who patently ignored opportunities to determine, the seriousness of Kerman's condition and whether he was dangerous to himself or others." <u>Id</u>. at 111. That was not the situation here. Defendants did not ignore opportunities to determine whether C.B. was a danger to himself or others. Rather, defendants considered all the available evidence, and in the face of conflicting evidence, decided to err on the side of caution. Tellingly, plaintiffs have not pointed to a single case for the proposition that, in the face of contradictory evidence, officers are obligated to take the word of a guardian that a purported EDP is not a danger to himself or others. And, for a right to be "clearly established" (thus barring qualified immunity), there must be at least one identified case "where

8

an officer acting under similar circumstances…was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. 548, 552 (2017); see also Ganek v. Leibowitz, 874 F.3d 73, 81 (2d Cir. 2017) (same). Qualified immunity, at a minimum, applies to bar C.B.'s false arrest claim.

B. Defendants Also Had Probable Cause, or Arguable Probable Cause, To Arrest C.B.

Plaintiffs argue that defendants did not have probable or arguable probable cause to arrest C.B. for harassment, criminal mischief, menacing, or assault because (i) "C.B. was doing nothing more than pacing back and forth when officers arrived on scene", and (ii) "the officers were aware that C.B.'s behavior prior to their arrival was attributable to his autism, or at least to his "special needs" status, rather than any intent to be disruptive or threaten anyone". PMOL, at 22. But both of these arguments are fatally flawed.  The first argument fails because defendants did not have to witness the criminal behavior themselves; they could reasonably rely upon the statements of complaining witnesses. Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006). The second argument fails because, first, there is no evidence that the defendants knew C.B.'s behavior was a result of his autism, second, tellingly, plaintiffs have not offered any citation for the proposition that officers cannot attribute criminal intent to someone with cognitive or developmental disabilities, and, third, "[t]he law has long recognized that probable cause does not demand evidence of every element of a crime — not even to support a person's arrest." Ganek, 874 F.3d at 83 (citation omitted). Rather, "when … a person's conduct satisfies the *actus reus* of a crime, we have moved well beyond mere suspicion". Id.

C. Handcuffing C.B. Was Not Illegal.

Plaintiffs argue that if there was no probable cause to arrest C.B. or invoke the MHL, then "[t]he defendant officers' handcuffing of C.B. was unlawful because C.B. was not a physical threat at the time he was handcuffed and there were less intrusive means to restrain

9

him." PMOL, at 18-19.[12] The first problem with this argument is that "the defendant officers" did not handcuff C.B. RSMF at ¶¶ 39, 41, 47. Second, C.B. did present a potential threat to others at or about the time he was handcuffed.[13] Dispatch reported that he was behaving violently, attacking staff, and destroying property, and was a biter. RSMF at ¶ 28. Destroyed property littered the room, corroborating the report by dispatch. Id. at ¶¶ 22, 36, 45. And, the week before, during a similar incident, C.B. bit someone, sending him to the hospital. Id. Under these circumstances, the non-party officers who handcuffed C.B. – whoever they were – had a reasonable basis for restraining him.[14] And, while plaintiffs claim that less intrusive means could have been used, they tellingly do not suggest what other methods.[15]

**3.      Plaintiffs Have Not Established Monell Liability For C.B.'s Hospitalization.**

At the outset, plaintiff's municipal liability claim premised upon C.B.'s hospitalization fails because there is no underlying constitutional violation. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). But, that is only one problem with it; there are others.

Plaintiffs' municipal liability claim is based upon an alleged failure to train. Specifically,

---

[12] The parties appear to agree that if Court finds that defendants had probable cause to either arrest C.B. or invoke the MHL, then the fact that C.B. was handcuffed was lawful. Soares v. Connecticut, 8 F.3d 917, 922 (2d Cir. 1993) ("[n]either the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if he does not resist or attempt to flee."). see also PMOL, at 19 ("Under the Fourth Amendment, an arrest **unsupported by probable cause** is unconstitutional unless (1) the plaintiff is a physical threat to the officers at the time of the arrest, and (2) officers use the least intrusive means of restraining the individual. US v. Bailey, 743 F.3d 322, 340 (2d Cir. 2014), cert. denied, 135 S. Ct. 705 (2014)") (emphasis added).

[13] Plaintiffs cite to U.S. v. Bailey, 743 F.3d at 340 for the proposition that to handcuff a person absent probable cause, the person handcuffed must present a present threat to the officers; this is only partially correct. Handcuffing is also permissible if the officers reasonably believe that the person presents a present physical threat to others. U.S. v. Newton, 369 F.3d 659, 674 (2d Cir. 2004).

[14] Plaintiffs claim that Officer Lewis testified that C.B. was handcuffed because he was pacing and appeared uncomprehending, not because he posed any threat to himself or others. PMOL, at 20. This was not Officer Lewis's testimony. Officer Lewis testified that "Q. At a certain point, was the boy, C.B., placed into handcuffs? A. Yes. Q. Who did that? A. I'm not sure. Q. Was it you? A. No. …Q. What prompted the officers to decide to put him in handcuffs? A. I guess maybe from the movement back and forth and not comprehending or understanding or something." Ex. I (Lewis Dep.), 16:13-19, 17:9-11. The question asked of Officer Lewis was speculative, as it called upon him to guess as to the thought process of other officers, he could not even identify. And, that he did guess, is obvious from his answer, where he said, "I guess, maybe".

[15] Plaintiffs argue, that per NYPD training manuals, C.B. should have been permitted to continue pacing. PMOL, at 20. First, as noted above, violation of internal procedures does not create a constitutional violation. And, beyond that, there was nothing preventing C.B. from pacing. His hands were in cuffs, not his feet.

10

plaintiff's stated theory is that "either the City had a policy of admitting every EDP to the hospital whether or not such hospitalization was justified under the Fourth Amendment, or it had a policy of failing to train its officers to provide them a correct understanding that automatic hospitalization is not the City's policy." PMOL, at 30. In support of their argument, they point to Lt. Pierce's testimony that "all EDPs go to the hospital". PMOL, at 29. But, plaintiffs mischaracterize Lt. Pierce's testimony, taking it completely out of context. Lt. Pierce was clear that the term "EDP" can be used in two ways: to describe a person who initially is reported to be emotionally disturbed, and to describe a person who has been determined to pose a danger to himself or others. When Lt. Pierce testified that "all EDPs go to the hospital", he was referring to designated EDPs -- those who have been determined to pose a danger to themselves or others. How do we know that? Because, Lt. Pierce was clear that not everyone who is initially reported to be an EDP will be formally designated an EDP and taken to the hospital:

> Q. Is it possible for the police to be called for somebody alleged to be an EDP and by the time the officers arrive the person is no longer in a disturbed state? A. Yeah. I mean, of course. Anything's possible. Q. So under those circumstances would you still require that person to be removed to the hospital? A. So there would be circumstances where you would and there would be circumstances where you wouldn't. Q. What are the circumstances where you would not remove somebody who had been classified as an EDP to the hospital? A. Well, we wouldn't -- so we are -- who are you saying classified the person as an EDP? Q. Well, that's what I'm asking you really. A. Well, you just referred to a person as classified as an EDP. Are you talking about it came over the radio that way? Q. Yes. A. So if it came over the radio as an EDP and we get there and there's no evidence that the person is actually acting oddly or in a manner dangerous to themselves of others and there's not a person there telling us the person is [] deranged, we're probably not going to remove them.

RSMF ¶ 108, Ex. J (Pierce Dep.) at 41:4-42:10.

Lt. Pierce described the MHL statute accurately, which is what governs the actions of NYPD officers Stated differently, there is no evidence the City has a policy of automatically

11

admitting all reported EDPs to the hospital. And even if the City had such a policy, there is no evidence that C.B. was taken to the hospital solely based on the dispatcher's use of the word EDP. On the contrary, staff at Lifespire told defendants that C.B. had been acting violent, and in a similar incident a week earlier, had gone so far as to bite someone. RSMF at ¶¶ 14-15. Simply put, plaintiff's stated theory of municipal liability fails in multiple respects.

Plaintiffs also make another unconnected argument under their municipal liability heading that defendants incorrectly believed that they did not need to obtain parental consent to transport C.B. under the MHL. PMOL, at 30. But the problem with this argument is that its premise is wrong. Plaintiffs have not pointed to any authority for the proposition that a parent's consent is required to transport a minor EDP to the hospital under the MHL. While they do point to FDNY and EMT training materials – exhibits 11 and 12 – for proposition that a parent must give consent before a minor patient can be "treated" (PMOL, at 30)[16], rendering medical treatment is different than invoking the MHL to transport a person to a hospital. The MHL contains no requirement that consent be obtained from an EDP, an EDP's guardian, or an EDP's next of kin prior to transporting the EDP to the hospital. And while internal policy provides that EMTs should call OLMC for guidance when a parent does not want her child transported to the hospital, as noted above in Section 2(A), failure to comply with an internal procedure does not make out a constitutional violation. Salim, 93 F.3d at 92.

Even beyond this basic problem with plaintiffs' municipal liability claim, there is the additional problem that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011) (internal quotation marks omitted). Here, plaintiffs have not established a pattern of similar constitutional violations. Yet, plaintiffs claim

---

[16] It turn citing ¶¶ 60 and 113 of their response to defendants' 56.1 statement, referencing exhibits 11 and 12.

the contrary, writing, "the City has repeatedly violated other minor EDPs' rights in the same manner [as C.B.], as evidenced by the settlement agreement in T.H. v. Farina et al.". PMOL, at 27. But, on the contrary, the Farina settlement is not indicative of other civil rights violations. The City expressly denied liability in the Farinas settlement[17]. Citing to another civil lawsuit does not state a claim for municipal liability because the fact of the lawsuit shows only that the allegation was made, "not that those violations actually occurred." Simms v. City of N.Y., 480 Fed. Appx. 627, 630 (2d Cir. 2012); Lipsky v. Commonwealth United Corp., 551 F.2d 887, 892-94 (2d Cir. 1976).

As for the NYPD training materials, plaintiffs' complaint there is that those materials "mock" and "stigmatize" EDPs. PMOL, at 8, 28. But plaintiffs have not established that such mockery or stigmatization was closely related to C.B.'s ultimate alleged injury. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (a plaintiff seeking to establish municipal liability must identify "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation.'"). Plaintiffs have also not established that any of the defendants saw these particular "mock[ing]" and "stigmatiz[ing]" materials; in fact, they allege that most of the defendants had not received EDP training since their days in the academy. PMOL, at 9.

In sum, these many problems with plaintiffs' municipal liability claim are fatal, particularly because "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. at 61.   The

---

[17] "Defendants deny that they have taken any action that violates the federal or state constitutions or federal, state, or local laws."; "Defendants deny any liability whatsoever to Plaintiffs and assert that they have meritorious defenses."; "Nothing in this Stipulation and Order of Settlement shall be deemed to be a finding or an admission that Defendants have in any way violated Plaintiffs' rights as contained in the constitutions, statutes, ordinances, rules and regulations of the United States, the State of New York or the City of New York." T.H., et al. v. Farina, et al., 13-cv-08777-JLC, D.E. #71.

claim must be dismissed.

## 4.      Plaintiffs have no Fourteenth Amendment Claim.

Plaintiffs argue that defendants did not seek to dismiss plaintiffs' sixth cause of action, and therefore it should survive. PMOL, at 31. But that is not true. Defendants addressed plaintiffs' sixth cause of action in footnote 4 of defendants' brief, stating that plaintiffs' sixth cause of action for false arrest fails because it arises under the Fourth, not Fourteenth, Amendment. DMOL, at 5, FN 4. But plaintiffs argue that their sixth cause of action is not for false arrest, but rather is a fourteenth amendment claim based on upon two separate theories, "for violation of Munoz's right as a parent to direct and control C.B.'s medical care and for violation of both Plaintiffs' rights to association and family integrity". Neither claim has merit.

First, plaintiffs' claim that Munoz had a Fourteenth Amendment right to direct and control C.B.'s medical care.  In support of that position, plaintiffs cite a string of cases none of which are applicable here.[18] Second, to the extent parents have the right to make medical treatment decisions on behalf of their children (with certain limitations), this case does not involve the issue of medical "treatment". No one "treated" C.B.  He was transported to a hospital so that psychiatric professionals could assess him. This "transport", not "treatment", is controlled by the MHL, which permits emergency responders to take individuals believed to be a threat to themselves or others to the hospital, with or without their consent. Neither does the law have a carve-out requiring consent from a minor's EDP's parent guardian. Thus, not surprisingly, plaintiffs have not pointed to a single case where any Court has found a Fourteenth Amendment

---

[18] Troxel v. Granville 530 U.S. 57 (2000) was a custody case, in which the Court found that parents can choose to deny grandparents visitation rights with their grandchildren. In Cruzan v. Dir., Mo Dep't of Health, 497 U.S. 261 (1990).the Court held that a hospital did not have to remove a patient's life support at the request of her parents where there was no clear and convincing evidence of the daughter's desire to have life-sustaining treatment withdrawn.In. In Parham v. J.R., 442 U.S. 584 (1979). the Court found that parents cannot involuntarily commit their own children; a neutral fact-finder must determine a basis for doing so. In Phillips v. Cty of Orange, 894 F. Supp. 2d 345 (S.D.N.Y. 2012). the Court granted qualified immunity to police officers who questioned a child at school without parental consent. Simply put, none of the cases cited to by plaintiffs have anything to do with the issue presented here.

14

violation premised upon the facts presented here. Plaintiffs' illusory Fourteenth Amendment claim fails, and at a minimum, defendants would are entitled to qualified immunity.

Plaintiffs' second bite at the Fourteenth Amendment apple based on a purported "violation of both Plaintiffs' rights to association and family integrity" is doubly flawed. First and foremost, plaintiffs' were not "forcibly separated" (PMOL, at 33) by virtue of C.B.'s transport to the hospital; they were separated because Munoz was arrested. Had she not been arrested (for which there was probable cause as set forth above), she would have been permitted to accompany C.B. to the hospital. RSMF ¶ 102. Second, while plaintiffs cite to a string of cases for the unremarkable proposition that there exists generally a Fourteenth Amendment right to familial association, plaintiffs have not cited to a single case that stands for the proposition that seizing a child under the MHL where his parent denies consent is a Fourteenth Amendment violation remediable under Section 1983.  And, there is a reason that plaintiffs have not cited to such a case – no such authority exists. Plaintiff's illusory Fourteenth Amendment claim fails for these reasons. It is also duplicative of their individual Fourth Amendment claims, which fail on their own, as set forth throughout this brief.

## CONCLUSION

For all these reasons, defendants' motion for summary judgment should be granted in its entirety.[19]

**[THIS SPACE INTENTIONALL LEFT BLANK.]**

---

[19] Plaintiffs have agreed to withdraw their claims against Commissions Nigro and O'Neil based on upon the decision in Tangreti v. Bachmann, No. 19-3712, 2020 U.S. App. LEXIS 40392 (2d Cir. Dec. 28, 2020), and the parties will be filing an appropriate stipulation to that effect.

Dated:        New York, New York
              January 22, 2021

                              James E. Johnson
                              Corporation Counsel of the
                              City of New York
                              *Attorney for Defendants*
                              100 Church Street
                              New York, New York 10007
                              (212) 356-2335


                    By:        *Elissa Fudim*
                              Elissa P. Fudim
                              *Senior Counsel*
                              Special Federal Litigation Division

16